[Cite as *In re J.B.*, 2013-Ohio-1703.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos. 98518 and 98519**

# IN RE: J.B.

# A Minor Child

# [Appeal by S.C., Great-grandmother]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD 09901436 and AD 09901437

**BEFORE:** S. Gallagher, J., Jones, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** April 26, 2013

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender

By: Cullen Sweeney
Assistant Public Defender
Courthouse Square Suite 200
310 Lakeside Avenue
Cleveland, OH    44113


**ATTORNEYS FOR APPELLEE, C.C.D.C.F.S.**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Michelle A. Myers
Assistant Prosecuting Attorney
C.C.D.C.F.S.
4261 Fulton Parkway
Cleveland, OH 44144

**Also listed:**

**Guardian ad Litem**

Michael B. Granito
24400 Highland Road
Suite 162
Richmond Heights, OH    44143

SEAN C. GALLAGHER, J.:

{¶1} In this consolidated appeal, S.C. appeals the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, in two separate underlying cases, each involving a different minor child. S.C. claims the trial court erred by denying her legal custody of the minor children and granting permanent custody to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). For the reasons stated herein, we affirm the judgment of the trial court in each case.

{¶2} Initially, we must recognize that the trial court's decision to grant permanent custody to CCDCFS and its best-interest determination were independently made as to each minor child. The minor children have different mothers; separate hearings were held; and separate opinions were issued by the trial court. J.B.-1 is the minor child of S.B., and J.B.-2 is the minor child of R.B. S.B. and R.B. are sisters. A.C. is the maternal grandmother of the minor children, and S.C. is their maternal great-grandmother.[1] Although the cases have been consolidated for review, we remain cognizant of the fact that the determination as to each child must be reviewed separately.[2]

{¶3} The procedural and factual background of each case is set forth below.

---

[1] The minor children and their relatives are referred to by initials in accordance with this court's established policy regarding nondisclosure of identities in all juvenile cases. S.B.'s first name is spelled two different ways in the record.

[2] We note that each child's mother and the maternal grandmother have also appealed the trial court's decisions. Those appeals and the issues raised therein are separately before this court. *See* 8th Dist. Nos. 98546, 98565, 98566, and 98567. In this appeal, we address only the matter as it relates to the denial of legal custody to S.C.

*In re J.B.*-1, Mother S.B.

**{¶4}** J.B.-1 was born on October 9, 2008, when S.B. was 13 years old. J.B.-1's father is unknown. J.B.-1 was committed to the emergency custody of CCDCFS on or about January 29, 2009. CCDCFS had previously been involved with S.B. in March 2008, because of her unruly and delinquent behaviors. At the time of J.B.-1's removal from the home, there had been an incident at another person's home involving S.B., R.B., and two males. During this incident, there was an argument; S.B. displayed a knife, and one of the males exhibited a gun. While this occurred, J.B.-1 was sleeping upstairs in a crib without a mattress. Also, the home was in deplorable condition and was rat- and roach-infested.

**{¶5}** The trial court adjudicated J.B.-1 as neglected and dependent, and on July 30, 2009, J.B.-1 was committed to the temporary custody of CCDCFS. In August 2009, J.B.-1 was placed into the foster family's home, where she remained during the course of the proceedings. Temporary custody with CCDCFS was extended.

**{¶6}** On January 28, 2011, CCDCFS filed a motion to modify temporary custody to permanent custody. On November 11, 2011, S.B. filed a motion for legal custody to herself. Additionally, A.C. filed a motion for legal custody to herself, and the guardian ad litem ("GAL") for the child filed a motion for legal custody of J.B.-1 to S.C. A hearing was held on the pending motions on November 17, 2011, January 24, 2012, and March 21, 2012.

**{¶7}** The record reflects that J.B.-1 was removed from S.B.'s care when she was only three months old. Following placement, she remained with the foster family for

over two and one-half years. Her cousin, J.B.-2, was placed in the same foster home. J.B.-1 was given structure; the foster parents attended to her needs; and she developed a strong bond with the foster family. While S.B. visited with J.B.-1 and demonstrated affection for her child, she was often late and had other family members present to assist her.

{¶8} CCDCFS presented evidence to demonstrate that despite her participation in provided services, S.B. failed to achieve the objectives of her case plan or to substantially remedy the conditions that caused the child to be placed outside the home. During the course of the proceedings, S.B. attended five different schools. Her attendance was an ongoing problem; she was suspended for an altercation with another student; and she was not on track academically. Although she attended counseling services and parenting programs, S.B. continued to display poor decision-making. Also, she displayed an inability to control her anger outbursts. There were reports of S.B. fighting in the community, and she was the subject of delinquency charges. There was evidence that on one occasion, S.B. left her three-year-old stepsister in a store by herself while she went outside to fight in a parking lot. As a result of this incident, S.B. was found delinquent for aggravated menacing and disorderly conduct. S.B. also missed certain medical appointments for J.B.-1 after becoming responsible for her own transportation. Further, in-home visits were initiated on two occasions but needed to be changed back to supervised visits because of S.B.'s poor decision-making. The GAL indicated that S.B. had "appeared to digress over time." The GAL had concerns about S.B.'s behavior and

her delinquencies, and also expressed concern for the safety of the child if returned to S.B.

{¶9} There was evidence showing that the maternal grandfather did not visit J.B.-1 and was not serious about custody, and that the maternal grandmother, A.C., had made insufficient progress for reunification. As found by the trial court, "[m]aternal grandmother continues to provide primary care for four minor children in her home, including [S.B.], and their needs; such that maternal grandmother was not always able to get [S.B.] to appointments with the child herein, or to more than 30% of scheduled visits. [S.B.] is a minor, and has not consistently been compliant with home rules and expectations." The GAL noted that A.C. had not attended all visits and questioned whether A.C. would protect and nurture J.B.-1 if given custody. There also was evidence that the grandmother had repeatedly indicated to the social workers that she was overwhelmed.

{¶10} While the great-grandmother, S.C., had substantially completed her case plan objectives, CCDCFS had expressed concerns regarding her criminal past and mental and physical health. S.C. had a felony conviction for gross sexual imposition in 1982 for which she served five years in prison. She also was not open with CCDCFS about her mental heath treatment and diagnosis, although she did provide a medical release.

{¶11} S.C. had moved from Texas to Cleveland when the children were taken into custody in 2009. The GAL recommended that the motion for permanent custody be denied and recommended legal custody to S.C. The GAL noted that S.C. had been found suitable for custody of other children, regularly attended visits with J.B.-1, and had an

appropriate residence. The GAL also believed S.C. would encourage visitation and possible reunification with S.B.

{¶12} On June 4, 2012, the trial court issued a decision committing J.B.-1 to the permanent custody of CCDCFS and terminating all parental rights of S.B. Among other findings, the trial court determined that J.B.-1 had been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period, that she had been in the temporary custody of CCDCFS for two years and no longer qualified for temporary custody, that she could not be placed with one of her parents within a reasonable period of time or should not be placed with either parent, and that it was in J.B.-1's best interest to be placed in the permanent custody of CCDCFS. The court denied the motions for legal custody filed by the various family members.

*In re J.B.-2*, Mother R.B.

{¶13} J.B.-2 was born on November 4, 2008, when R.B. was 15 or 16 years old. J.B.-2 was committed to the emergency custody of CCDCFS on or about January 29, 2009. The trial court adjudicated J.B.-2 as neglected and dependent, and on June 2, 2009, J.B.-2 was committed to the temporary custody of CCDCFS. In August 2009, J.B.-2 was placed into the foster family's home, where she remained during the course of the proceedings.

{¶14} Great-grandmother, S.C., filed a pro se motion for legal custody of J.B.-2, which motion was held in abeyance by agreement of the parties. Temporary custody with CCDCFS was extended. In July 2010, CCDCFS filed a motion to modify temporary custody to permanent custody. Also in July 2010, the maternal grandmother,

A.C., filed a motion for legal custody and the maternal grandfather filed a motion for legal custody. The trial court denied the foster parents' motion to intervene, and that decision was affirmed on appeal by this court. *In re J.B.*, 8th Dist. No. 96652, 2011-Ohio-4830. In December 2010, R.B. filed a motion for legal custody to herself. A hearing was held on the pending motions on February 9 and 10, 2012.

{¶15} A review of the record reflects that J.B.-2 was removed from her mother's care when she was less than three months old. Following placement, she remained with the foster family for over two and one-half years. Her cousin, J.B.-1, was placed in the same foster home. J.B.-2 was given structure by the foster family. She developed a strong bond with the foster family, and the foster parents provided for her emotional and medical needs. On the other hand, there was evidence that J.B.-2 resisted visits with her mother and other biological family members and was exhibiting negative behaviors as a result of the visits.

{¶16} A social worker on the case testified that J.B.-2 would get upset when she entered visits and vocalize that she did not want to be there; however, she would calm down. There was evidence that R.B. would hold the child during visits and attend to the child's needs. Also, J.B.-2 called R.B. "Mommy." R.B.'s visits with J.B.-2 were mostly supervised, and other family members were present.

{¶17} By the time of the hearing, R.B. was no longer a minor, and she had a second child, who is J.B.-2's sibling and remains in R.B.'s care. While R.B. was making progress on her case plan, successful completion of a case plan is not dispositive on the issue of reunification and does not necessarily preclude a grant of permanent custody to a

children services agency. *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.). "A parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the [child] to be removed[.]" *Id.* In R.B.'s case, she initially resisted engaging in services, including services to address her mental health needs. R.B. also had anger issues, and there were reports of her fighting in the community. During the course of the case, R.B. had been through six different schools and did not attend on a regular basis. Although R.B. at one point enrolled in GED classes and she attended life skills classes, she had not completed her education and was at a 10th or 11th grade level as of September 2011.

{¶18} After R.B. reached the age of majority, the case plan was amended to include a housing component. R.B. resided in a home with her older sister, and was named on the lease for a time. However, R.B. continually moved back and forth to her mother's home because she would become involved in conflicts with the family members. Although there was evidence indicating that R.B. had recently applied for HUD housing and was enrolled with counseling services through Murtis Taylor, a local social services agency, she had not demonstrated consistency or stability over the course of the case. Further, while R.B. was appropriately caring for her new child, a social worker believed she was overwhelmed and adding a second child to the home would make the situation worse.

{¶19} The GAL expressed that R.B. had matured over the course of the case, was doing a good job with her second child, and showed appropriate behavior with her children. The GAL recommended that the motion for permanent custody be denied and

recommended legal custody to R.B. However, the GAL believed there would need to be a transition period and that J.B.-2 would need time to bond with R.B. The GAL had not observed the child in the foster family's home since 2009.

{¶20} There was evidence showing that the maternal grandfather rarely visited J.B.-2 and that the maternal grandmother, A.C., had made insufficient progress for reunification. A.C. was inconsistent in appearing for visits, has four minor children of her own, and indicated several times that she was overwhelmed. She also would get angry with the social worker in front of J.B.-2. The GAL questioned whether she would protect and nurture the child if given custody.

{¶21} While the great-grandmother, S.C., had substantially completed her case-plan objectives, CCDCFS expressed the same concerns raised in J.B.-1's case. Here again, the GAL noted that S.C. had been found suitable for custody of other children, regularly attended visits with J.B.-2, and had an appropriate residence. The GAL also believed S.C. would encourage visitation and possible reunification with mother.

{¶22} On June 4, 2012, the trial court issued a decision committing J.B.-2 to the permanent custody of CCDCFS and terminating all parental rights of R.B. and the father of J.B.-2. Among other findings, the trial court determined that J.B.-2 had been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period, that she had been in the temporary custody of CCDCFS for two years and no longer qualified for temporary custody, that she could not be placed with one of her parents within a reasonable period of time or should not be placed with either parent, and that it

was in J.B.-2's best interest to be placed in the permanent custody of CCDCFS. The court denied the motions for legal custody filed by the various family members.

### S.C.'s Consolidated Appeal and Assignment of Error

**{¶23}** S.C. claims in her sole assignment of error that

[t]he trial court erred in denying [S.C.'s] motions for legal custody and electing instead to award permanent custody to [CCDCFS].

**{¶24}** A trial court may terminate parental rights and grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, that one of four conditions set forth in R.C. 2151.414(B)(1)(a)-(d) applies, and that permanent custody is in the best interest of the child. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 23. "Clear and convincing evidence" is evidence that "will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

**{¶25}** In each of the underlying cases, CCDCFS established that the condition set forth under R.C. 2151.414(B)(1)(d) was satisfied. As the trial court found in each case, the minor child "has been in temporary custody of a public children services agency * * * for twelve or more months of a consecutive twenty-two month period." S.C. does not contest this determination.

**{¶26}** Although not required, in each case, the trial court also addressed the condition set forth under R.C. 2151.414(B)(1)(a), and correspondingly the factors under R.C. 2151.414(E), and found that the minor child, who was not abandoned or orphaned,

could not be placed with either of her parents within a reasonable period of time or should not be placed with either parent. However, because R.C. 2151.414(B)(1)(d) applied, the court did not need to reach this determination. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21. This is because the "12 of 22" provisions set forth in R.C. 2151.413(D)(1) and 2151.414(B)(1)(d) already provide parents with 12 months to work toward reunification and "balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child." *Id.* at ¶ 22.

**{¶27}** The focus of S.C.'s appeal is her claim that the court erred in determining the best interest of each child was to award permanent custody to CCDCFS rather than to award legal custody to S.C. We must emphasize that it is the best interest of the child, not the parent or family, that matters.

**{¶28}** Our review of each case reflects that in considering the best interest of the child, the trial court considered all relevant factors, including the factors set forth in R.C. 2151.414(D)(1), which include the following: (1) the interaction and interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) apply. It is evident from the record that none of the factors in divisions (E)(7) to (11) were present.

**{¶29}** S.C. argues that the trial court did not afford enough significance to the positive relationships the children had with their biological family and that the importance

of this relationship favors granting legal custody to a suitable family member. S.C. asserts that the mothers have shown affection with the children and never abused them; the children are bonded to their mothers; the children are close in age and extremely close with each other; J.B.-2 now has a biological sibling who is receiving appropriate care from R.B.; the children have a close relationship with the other family members; and S.C. has a genuine interest in the children.

{¶30} While each child may have a bond and a positive relationship with biological family members, the children have been living with the foster family for the majority of their young lives. They were nurtured on a daily basis, and after two and one-half years with the foster family, they had developed a significant bond and a sense of security with the foster family. There was evidence that J.B.-2 was apprehensive about visiting with her biological family and exhibited negative behaviors as a result of the visits. Attempts to implement in-home visitation for J.B.-1 were unsuccessful, and S.B. continued to engage in fights and exhibit poor decision-making.

{¶31} It is evident that the biological family loves the children and that S.C. showed commitment to them. Although family unity and "blood relationship" are important factors to consider, neither is controlling. *In re T.W.*, 8th Dist. Nos. 86084, 86109, and 86110, 2005-Ohio-6633, ¶ 15. Nor is the mere existence of a good relationship. *Id.* Rather, all relevant factors must be considered when determining the best interest of the child. R.C. 2151.414(D)(1). "A child's best interests require permanency and a safe and secure environment." *In re Holyak*, 8th Dist. No. 78890, 2001 Ohio App. LEXIS 3105 (July 12, 2001).

**{¶32}** S.C. also claims the trial court ignored the GAL's recommendations. Our review reflects that the trial court heard testimony from the GAL and considered the recommendation in each case; however, the court determined each recommendation was contrary to the best interest of the child. The court's decision was supported by clear and convincing evidence in the record. A trial court is not bound to accept the recommendation of the guardian ad litem, and the ultimate decision is for the judge upon a consideration of all evidence presented. *In re T.S.*, 8th Dist. No. 92816, 2009-Ohio-5496, ¶ 34.

**{¶33}** Next, S.C. attempts to minimize the custodial history of the children by suggesting that the length of custody was attributable to delay caused by the trial court. However, that was not the case in this matter. R.B. and S.B. were teenage mothers who were not consistently engaging in the services provided and were afforded time to mature and progress with their case plans. Temporary custody was extended, and the agency continued to work with the mothers. S.C. agreed to hold her motion for legal custody in abeyance in J.B.-2's case. The reality remains that J.B.-1 and J.B.-2 were in the temporary custody of CCDCFS for three years and have been with the foster family for a significant period of time. These were appropriate considerations for the trial court.

**{¶34}** Finally, S.C. argues the trial court erred in considering whether the children's need for a legally secure placement could be achieved without a grant of permanent custody. S.C. states she is committed to the children, has appropriate housing, and is capable of providing a legally secure placement. While S.C. asserts that a CCDCFS social worker agreed with her, the record reflects that the agency had

concerns with her prior criminal conviction and with her mental and physical health and did not approve her for placement.[3] Nonetheless, S.C. maintains that the decision of CCDCFS not to consider her for placement was based on a 1982 conviction, that she had received custody of other children, and that her prior conviction was not the basis for the trial court's denial.

**{¶35}** S.C. also claims the trial court found there were relatives able to take custody and that the court's sole basis for denying her legal custody was that the agency remained concerned that she would not disclose the reason she was receiving mental-health treatment from Murtis Taylor, yet she provided a release. S.C. initially was not forthcoming about this information to CCDCFS, and the court recognized this concern. There was no false premise in this regard. Furthermore, the court was not required to detail every factor it found applicable in its determination or to provide a specific explanation. The court heard extensive testimony in each case and made the requisite considerations. We find no abuse of discretion by the trial court.

**{¶36}** Even if S.C. were a suitable relative, "[t]he statute does not make the availability of a placement that would not require a termination of parenting rights an all-controlling factor [and] does not even require the court to weigh that factor more heavily than other factors." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 63. Rather, the statute "requires the court to find the best option for the child[.]" *Id.*

---

[3] We note that CCDCFS could not place the children with great-grandmother because of her prior felony conviction. *See* Ohio Adm.Code 5101:2-42-18(F) and 5101:2-7-02(K).

**{¶37}** Upon a thorough review of the record, we find the trial court's determination in each of the underlying cases is supported by clear and convincing evidence. We also find no abuse of discretion by the trial court and the decisions are not against the manifest weight of the evidence. We further recognize that the court's determination is consistent with the legislature's intent to encourage the speedy placement of children into permanent homes. After three years in temporary custody, the objective of permanency for J.B.-1 and J.B.-2 was well overdue. "[N]eglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term * * * and their best interest is the pivotal factor in permanency cases." *In re T.S.*, 8th Dist. No. 92816, 2009-Ohio-5496, at ¶ 35.

**{¶38}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


SEAN C. GALLAGHER, JUDGE

TIM McCORMACK, J., CONCURS;
LARRY A. JONES, SR., P.J., DISSENTS (WITH SEPARATE OPINION)

LARRY A. JONES, SR., P.J., DISSENTING:

**{¶39}** Respectfully, I dissent and conclude the trial court abused its discretion when it determined that the grant of permanent custody to CCDCFS was in the best interest of the children.

**{¶40}** The termination of parental rights is "the family law equivalent of the death penalty in a criminal case; therefore, parents must be afforded every procedural and substantive protection the law allows." (Citations omitted.) *In re D.A.*, 113 Ohio St.3d 88, 91, 2007-Ohio-1105, 862 N.E.2d 829. "The termination of parental rights should be an alternative of 'last resort.'" *Id.,* citing *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979).

**{¶41}** Because both children had been in the custody of CCDCFS for more than 12 months out of a 22-month period, the trial court had only to conclude what was in the children's best interest pursuant to R.C. 2151.414(D).

**{¶42}** R.C. 2151.414(D)(1) provides that "[i]n determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶43}** The factors listed in R.C. 2151.414(E)(7) to (11) include a parent's criminal convictions, whether the parent has withheld medical treatment or food from the child, has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse, abandoned the child, and whether the parent has previously had her or his parental rights terminated as to another child.

<u>J.B.-1</u>

**{¶44}** Based on my review of the record and trial transcripts, I would find that the trial court erred in granting the agency's motion for permanent custody; I disagree that it is in the child's best interest for the agency to take permanent custody. Instead, the trial court should have granted appellant's motion for legal custody and placed the child with her.

**{¶45}** In considering the best interest factors in R.C. 2151.414(D), the first factor involves the interaction and interrelationship of the child with her parents, siblings, and other relatives and significant people in her life. R.C. 2151.414(D)(1)(a). This best interest factor is "highly significant" and "focuses on a critical component of the permanent custody test: whether there is a family relationship that should be preserved." *In re A.W.*, 9th Dist. No. 09CA009631, 2010-Ohio-817, ¶ 14, citing *In re CM.*, 9th Dist. No. 21372, 2003-Ohio-5040, ¶ 11.

{¶46} The majority of the evidence before the trial court on this factor weighs in favor of preserving the family relationship. J.B.-1's mother, S.B., participated in case plan services and has shown a bond with her child. She attended visitation, was loving towards her child, and was alert to her child's needs. Although the record evidenced that the child's minor mother is not ready to take custody of her daughter, if legal custody is granted to a family member then the ties between mother and child, and between the child and her relatives, will remain.

{¶47} As to R.C. 2151.414(D)(1)(b), the GAL for the child reported that the child was too young to indicate her wishes. The GAL recommended against a grant of permanent custody, finding that a permanent sever of family ties was inappropriate because suitable family members were willing to take custody of the child and the extended family had demonstrated its commitment to J.B.-1. The GAL recommended legal custody be granted to S.C.; finding that she would encourage visitation with and possible reunification of child with the mother, but would put the best interests of the child first, even if it conflicted with the mother's desires.

{¶48} In relation to the custodial history of the child, R.C. 2151.414(D)(1)(c), the majority concludes that the length of delay is solely attributable to the mother's inconsistency with following through on her case plan objectives. I disagree. The agency filed for permanent custody on January 28, 2011. On February 10, a magistrate extended temporary custody, but the trial court did not approve the magistrate's decision until the next month. Then the trial court did not hold another hearing until August 30, 2011, when it continued the matter for trial on November 17, 2011.

{¶49} Trial began on November 17, but was continued until January 24, 2012, at the request of the family. Trial continued on January 24 and was then continued again until March 21 and 22, 2012, for additional testimony.

{¶50} Thus, it took the trial court 10 months from the time the motion for permanent custody was filed to commence trial and then another four months for the trial court to finish three more days of testimony. Trial ended on March 22, 2012, but the trial court did not issue its decision until June 4, 2012. Consequently, J.B.-1 spent approximately 17 months in the agency's custody from when the motion for permanent custody was filed until the trial court ruled on the motion.

{¶51} Although I understand that there were some issues that may have delayed the trial, to me, 17 months from motion filed to motion decided is an unacceptable length of time, especially given the young age of the child. Thus, I would not find that the length of the custodial history should be solely attributable to the mother's actions.

{¶52} Considering R.C. 2151.414(D)(1)(d), and whether J.B.-1's need for legally secure permanent placement can be achieved without a grant of permanent custody, the transfer of legal custody to a suitable relative achieves that goal without taking the drastic step of permanently divesting the mother of her residual parental rights, privileges, and responsibilities. *See generally In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus.

{¶53} As the majority opinion acknowledges, when the child was initially taken into custody appellant relocated from Texas to Cleveland for the sole purpose of assisting her family. The social worker testified that appellant attends visitation with the child

every week, often being the first family member to arrive, always brings snacks for the child, and stays for the entire three-hour visit. The social worker further testified that appellant has suitable housing, receives income from Social Security, and is a good parenting role model. In fact, overnight visitation with the mother and child happened at appellant's home.

{¶54} After appellant was added as a party to the case, the agency filed an amended case plan requiring appellant to complete a parenting course and sign a medical release for her mental health service provider; she completed both objectives.

{¶55} Even though the agency was prohibited from placing the child with appellant because of a 30-year-old conviction, the same does not apply to the court. While Ohio Adm.Code 5101:2-42-18(F) and 5101:2-7-02(K) may prevent a public children services agency from placing children in a relative's home if the relative or another adult living in the home has a sexual assault conviction, this prohibition does not apply to the courts. *See In re Needom*, 1st Dist. Nos. C-080107 and C-080121, 2008-Ohio-2196, ¶ 23. ("Theoretically, a court could still award custody even though the relative or other adult in the home has a conviction.")

{¶56} The majority asserts that because applicable statutes do not require a court to consider placing a child with a relative before granting permanent custody to a state agency and because the juvenile court has discretion to determine what placement option is in the child's best interest, the court in this case did not err in its assessment of what was in the child's best interests. While the premise as stated above may be true, I disagree that the court's decision was supported by clear and convincing evidence. The

best option, the best interest of this child, is to retain the ties she has with her biological family. Moreover, the fact that there is a suitable, loving, and committed relative placement with S.C. cannot be discounted just because the agency was prohibited from facilitating that placement.

{¶57} Thus, I advocate that legal custody of J.B.-1 be granted to appellant with the agency providing protective supervision.

{¶58} Finally, in considering R.C. 2151.414(D)(1)(e), there is no dispute that none of the factors apply in this case. It is important to note, however, that the fact that none of these factors apply weighs in favor of the mother and against a grant of permanent custody.

{¶59} Even though the mother was only 13 years old when she gave birth to J.B.-1, almost four years have passed, and, without a doubt, the mother has a strong and loving family network. The fact of the matter is, even if the child's mother is not presently able to parent her child, a legally secure family placement exists that would save the court from taking the drastic, harsh, and irrevocable step of terminating the mother's parental rights. Simply put, to permanently cut the bonds of this family to J.B.-1 would not be in the child's best interests and the state failed to show otherwise by clear and convincing evidence.

{¶60} In light of the above, I would find that the trial court abused its discretion in granting the motion for permanent custody as to J.B.-1.

<u>J.B.-2</u>

**{¶61}** I would find that the trial court abused its discretion in granting permanent custody of J.B.-2 to the agency and that legal custody should be awarded to the child's mother, R.B.

**{¶62}** In considering the interaction and interrelationship of the child with her mother, siblings, other relatives and significant people in her life pursuant to R.C. 2151.414(D)(1)(a), the majority of the evidence before the trial court weighed in favor of preserving the family relationship. J.B.-2's mother, R.B., had completed her case plan, had shown a bond with her child, was raising her second child without CCDCFS's involvement, and was securing her own housing. She attended visitation every week, was loving towards her child, and was alert to her child's needs. Similar to her sister, R.B. had the support of her family, specifically her mother, grandmother, and older sister.

**{¶63}** The GAL for J.B.-2 reported that the child was too young to express her wishes under R.C. 2151.414(D)(1)(b). The GAL for the child recommended against a grant of permanent custody, finding that R.B. had matured and would be able to take care of her daughter. He observed her acting appropriately with both of her children, she took good care of her younger child, and had the assistance of her family, including her older sister, who displayed good parenting skills.

**{¶64}** In relation to the custodial history of the child, R.C. 2151.414(D)(1)(c), I must again disagree with the majority's conclusion that the length of delay is solely attributable to the mother's inconsistency with following through on her case plan objectives. The agency filed for permanent custody on July 20, 2010, but the motion did not proceed to trial until February 9 and 10, 2012. The trial court issued its ruling on

June 4, 2012. Thus, over a year and a half elapsed from the time the motion was filed until it was granted. While I am cognizant that there was an intervening appeal filed by the foster parents and that these matters take some time, a year and a half in the life of a young child is too long for a motion of this kind to be pending.

{¶65} Considering R.C. 2151.414(D)(1)(d), and whether J.B.-2's need for legally secure permanent placement can be achieved without a grant of permanent custody, the evidence overwhelmingly showed that the mother herself could provide a stable, permanent home for J.B.-2. She does, however, continue to need the services and guidance offered by CCDCFS; thus, I would recommend that placement with the mother be accompanied by protective supervision.

{¶66} Finally, in considering R.C. 2151.414(D)(1)(e), there is no dispute that none of the factors apply to J.B.-2. And the fact that none of these factors apply weighs in favor of the mother and against a grant of permanent custody.

{¶67} The trial court's decision to grant permanent custody of the children to CCDCFS was not supported by competent, credible evidence. Accordingly, I would conclude that the trial court abused its discretion when it determined that permanent custody was in the best interest of the children. I would: (1) reverse the trial court's decision granting permanent custody to CCDCFS; (2) grant legal custody with protective supervision of J.B.-1 to the great-grandmother, S.C.; and (3) grant legal custody with protective supervision of J.B.-2 to the mother, R.B.