OPINION
{¶ 1} Appellants, Bonnie E. and Kenneth S. appeal a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of their child to the Butler County Children Services Board ("BCCSB").
 {¶ 2} On April 2, 2003, a baby girl, A.S., was born to appellants. The following day, BCCSB filed a complaint alleging that A.S. was a neglected and dependant child. On the same day, an ex parte order was issued granting temporary custody to BCCSB, and A.S. was removed directly from the hospital to foster care. A dependency finding was later entered, and hearings were held on disposition of the child. A magistrate granted permanent custody of the child to BCCSB on April 4, 2004. Appellants filed objections, and the trial court affirmed the magistrate's decision on July 9, 2004.
 {¶ 3} Appellants separately appealed the trial court's decision to grant permanent custody and on appeal, the cases were consolidated by this court. Kenneth raises one assignment of error for our review, and Bonnie raises two assignments of error.
 {¶ 4} In Kenneth's single assignment of error and Bonnie's first assignment of error both argue that the trial court's decision to grant permanent custody was not supported by clear and convincing evidence. Bonnie's second assignment of error contends that the trial court erred in finding permanent custody was in the best interest of the child and was against the manifest weight of the evidence. Because these assignments of error are interrelated, we address them together.
 {¶ 5} Natural parents have a constitutionally protected liberty interest in the care and custody of their children.Santosky v. Kramer (1982), 455 U.S. 745, 759, 102 S.Ct. 1388. The rights and interests of a natural parent are not, however, absolute: where a court finds that permanent custody is appropriate under circumstances of a particular case and all due process safeguards have been followed, whatever residual rights a parent may have are properly divested. In re Cunningham (1979),59 Ohio St.2d 100, 105.
 {¶ 6} Before severing a parent's constitutionally protected liberty interest in the care and custody of his or her children, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met.Santosky at 769. Clear and convincing evidence requires that the proof produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Cross v.Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. Appellate review of a trial court's decision finding clear and convincing evidence is limited to determining whether "sufficient credible evidence" exists to support the trial court's determination. In re Ament (2001), 142 Ohio App.3d 302,307; In re Starkey, 150 Ohio App.3d 612, 2002-Ohio-6892, at ¶16.
 {¶ 7} A juvenile court must apply a two-part test when determining whether to terminate parental rights and award permanent custody to a public or private children services agency. R.C. 2151.414(B). The juvenile court must find by clear and convincing evidence both: 1) the grant of permanent custody to the agency is in the best interest of the child; and 2) that any of the following apply: the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; the child is abandoned; the child is orphaned; or the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period. R.C. 2151.414(B)(1).
 {¶ 8} In this case, the trial court found that it was in the best interest of A.S. to grant permanent custody to the agency and that she could not be placed with either parent within a reasonable time. Appellants present various arguments to support their contention that the trial court erred in granting permanent custody. Their various arguments center around their assertion that they have the ability to parent A.S. but that they were not given the opportunity.
 {¶ 9} Because it is necessary to the resolution of this case, we begin with a discussion of facts occurring before the birth of A.S. In October of 1997, Bonnie gave birth to a son. After brief periods in foster care, the child was removed from the home in May 1997. After two years of appellant failing to address the problems that caused the removal, the agency sought permanent custody of the child. Permanent custody was granted to the agency in May 1999. The problems included Bonnie's limited intellectual capacity, along with emotional and psychological problems which made her ill-equipped to be a parent. Furthermore, the juvenile court found that Bonnie failed to participate in any of the services offered, other than those that were "spoon-fed" to her. This court affirmed the trial court's decision to grant permanent custody to BCCSB. In re Elliott (May 15, 2000), Butler App. No. CA99-05-097.
 {¶ 10} In May 2000, a baby girl was born to Bonnie and Kenneth. Due to the agency's concerns necessitating the removal of Bonnie's son, and the fact that Bonnie failed to obtain prenatal care, BCCSB obtained temporary custody of the child. At the time of the child's birth, Bonnie was living with Kenneth and his wife, Tammy. Kenneth described Bonnie as his "fiancée," despite the fact that he was married to Tammy. After the child's birth, the three adults, along with the Kenneth's daughter, continued to live together.
 {¶ 11} Bonnie's Social Security income was the primary source of income for the household. Tammy was not employed and Kenneth was unable to maintain regular employment. Appellants were also unable to maintain steady housing and moved numerous times. In addition to Bonnie's intellectual, emotional and psychological problems as detailed in the previous case, there were also problems with cleanliness of the home. Despite assistance from the agency, appellants were unable to keep the house appropriately cleaned for an infant. At the time of the permanent custody hearing, another couple was living in the house with appellants.
 {¶ 12} BCCSB prepared a case plan for appellants that involved counseling, in-home training and classes on issues related to parenting. Despite classes and training, Bonnie was unable to implement what she learned in classes into real-life parenting situations. She was unable to meet the everyday needs of the child, yet became defensive when suggestions were made, insisting she knew how to parent. Kenneth demonstrated little progress in the case plan, failing to attend many of the classes and services provided. In addition, appellants failed to visit the child as provided by the case plan, missing many of the scheduled visits.
 {¶ 13} Bonnie and Kenneth were evaluated by a psychologist who found that Bonnie has a personality disorder, and that Kenneth was borderline in natural functioning. He found both appellants would have problems in their ability to parent. In addition, appellants' first child had special needs which required attentive parenting.
 {¶ 14} At the permanent custody hearing for appellants' first child, Kenneth denied being intimate with Bonnie. Appellants also denied that Bonnie was pregnant, although the trial court noted that she was noticeably pregnant at the hearing. The juvenile court granted permanent custody of the child to BCCSB. Bonnie and Kenneth each individually appealed that decision and this court affirmed. In re Baby Girl Elliott, Butler App. No. CA2003-04-096, 2003-Ohio-5876; In re Baby Girl Elliott,
Butler App. No. CA2003-10-256, 2004-Ohio-3539.
 {¶ 15} At the time A.S. was born, little had changed in appellants' lives. Bonnie, Kenneth, his wife Tammy and their daughter all continued to live together. Bonnie claimed to have obtained prenatal care for the child and provided ultrasounds to the court as proof, but other details about the prenatal care were vague. When the child was removed at the hospital, BCCSB set up a regular visitation schedule for appellants to see the child twice a week. No other services were included in the case plan.
 {¶ 16} At an early hearing, Kenneth testified that he was earning money from his scrapping business and lawnmower repairs, and that their friends were still living with them in the house. He also stated that he wasn't sure if A.S. was his baby.[1]
He also admitted that that his wife, Tammy, previously had two of her children permanently removed from her care.
 {¶ 17} At a pretrial on the case, BCCSB explained that services were provided to appellants in the past but were discontinued, and because they were seeking permanent custody, BCCSB did not think services were appropriate. The guardian ad litem for A.S. questioned whether services could be provided if appellants demonstrated their commitment to A.S. by complying with visitation. A discussion took place regarding various services available outside the agency and how appellants could protect their interests and seek these services on their own. At a hearing in October 2003, a dispositional hearing was scheduled for February. It was agreed that at that time the parties would evaluate whether appellants had become involved in services to improve their ability to parent. BCCSB prepared a letter with a list of outside services and both mailed a copy of the letter and handed it to appellants.
 {¶ 18} At the disposition hearing on February 17, 2004, Kenneth produced a letter from a service agency which said that he called on February 4, 2004 and was put on a waiting list for services pending his completion of the required paperwork. Kenneth requested more time in order to obtain services. This request was opposed by both BCCSB and the guardian ad litem since almost four months had passed since the previous hearing when appellants were given information about outside services. The trial court denied the request for additional time.
 {¶ 19} The evidence at the various hearings showed that appellants made little progress to remedy the other problems that necessitated the removal of their older child. The GAL stated that on a scheduled visit to the home, it was tidy and fairly clean, although there was an old rug on the stairs that smelled bad. BCCSB workers were unable to observe the condition of the home on unannounced visits because the family was not home, or because Bonnie would not let them enter when Kenneth was not home. Although unable to see the inside, the caseworker testified that on her visits she saw a lot of trash and clutter in the outside hallway of the house, including a dead animal in a cage.
 {¶ 20} The psychologist who had previously evaluated Bonnie and Kenneth testified that it was difficult for him to say whether the two were currently able to parent in spite of their mental conditions because he had recommended a number of interventions, and he did not know how successful they were at completing them. He testified that their inability to gather services for themselves relates to their ability to take care of a child. He explained that their inability to access programs and help impacts their overall ability to access any help for issues down the road with the child.
 {¶ 21} BCCSB family resource coordinator, Artha Shollenbarger, testified that she supervised visits and helped with transporting A.S. to visits. She stated that the visits were originally two per week, but the family requested reducing the visits to only one per week because they did not have time to come twice a week. The visits were later changed back to two per week when appellants complained about not having enough visitation. Shollenbarger testified that from November 2003 to February 2004 two visits were scheduled per week; however, appellants attended only two visits in the month of November, one visit in December, one in January and none in February. She indicated that of a total of 23 visits scheduled in this time, appellants attended only four visits. Because of the numerous missed visits, the agency required appellants to phone the morning of the visit before it would transport A.S. to the visit.
 {¶ 22} Shollenbarger stated that illness in the family was often an excuse for missed visitations. However, she told appellants that if they would bring in a physician's note she would reschedule the visitation so that none were missed. Despite this ability to make up missed visitations, Kenneth only once brought an excuse. Other reasons for missed visits were transportation problems. Kenneth is the only adult in the family with a driver's license and said that the vehicle he used often had problems. However, Kenneth later testified that he travels "all over" for his scrapping business several times per week.
 {¶ 23} Shollenbarger testified that in the past she had worked with appellants to provide family resources in their home, but there was no progressive improvement. She further stated that the family dynamics cause problems because Tammy makes all of the calls to the agency for the family. She indicated that there was a lot of chaos involved in conversations and interaction with family members because what was said to one family member was often misconstrued, misinterpreted and changed over time.
 {¶ 24} A.S.'s foster mother testified that she also has the child's older sister in her home and the two girls have bonded. She indicated that A.S. is doing well and she would like to adopt the child.
 {¶ 25} We begin by reviewing the trial court's determination that it was in the child's best interests to grant permanent custody to the agency. R.C. 2151.414(D) provides a nonexhaustive list of factors for the trial court to consider in making a best interest determination. The relevant factors include, but are not limited to, the following:
 {¶ 26} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 27} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 28} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 29} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 30} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 31} Considering these factors in light of the facts of this case, A.S. is bonded and has a relationship with her sister and foster mother. Although interaction between appellants and the child has been appropriate, it has been sporadic and inconsistent. While A.S. is too young to express a preference, her guardian ad litem recommended granting permanent custody to BCCSB. A review of the child's custodial history shows that she has been in foster care since birth and has never lived with her parents.
 {¶ 32} Testimony at the hearing indicated that permanency cannot be achieved without granting permanent custody to the agency. Little progress was made from the time A.S.'s sister was removed regarding appellants obtaining services that would improve their situation. Although appellants remained in the same home and presented evidence that they have "evicted" their friends from the home, little else has changed. Numerous visits with A.S. were missed and not rescheduled. In the four months prior to the final hearing, visits were negligible. As noted by the trial court, appellants appear to blame others for their problems, which the court noted was "an exercise in futility."
 {¶ 33} Finally, one of the factors in 2151.414(E)(7) to (11) is whether the parents have had a sibling of the child removed from their home. As discussed above, Bonnie has had a son removed, and Kenneth and Bonnie had a daughter removed from their home.
 {¶ 34} Considering the evidence in light of the factors above, we find substantial and credible evidence that it is in A.S.'s best interest to be provided with a safe and stable home environment that can only be available through permanent custody.
 {¶ 35} We now turn to the trial court's determination that A.S. could not be placed with either parent within a reasonable time. In considering this requirement, R.C. 2151.414(E) provides that the trial court shall consider all relevant evidence. This provision also provides that a trial court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent if "[t]he parent has had parental rights involuntarily terminated pursuant to this section * * * with respect to a sibling child." As discussed above, both parents have had their parental rights terminated with respect to a sibling of A.S. Therefore, the trial court was required to make a determination that A.S. could not be placed with either parent within a reasonable time or should not be placed with either parent.
 {¶ 36} Appellants both argue that their interaction with A.S. at visits was appropriate, that BCCSB never attempted to re-unify the family, and that they were never given the opportunity to parent. However, "[a] juvenile court should not be forced to experiment with the health and safety of a newborn baby where the state can show, by clear and convincing evidence, that placing the child in such an environment would be threatening to the health and safety of that child." In re Pieper Children (1993),85 Ohio App.3d 318, 325, quoting In re Campbell (1983),13 Ohio App.3d 34, 36. Finally, the child does not first have to be put into a particular environment before a court can determine that that environment is unhealthy or unsafe. Campbell at 36. The unfitness of a parent, guardian or custodian can be predicted by past history. In re Bishop (1987), 36 Ohio App.3d 123, 521.
 {¶ 37} The fact that A.S. was removed from appellants without case plan services cannot be viewed in a vacuum. Appellants' prior history shows a complete inability to follow through, complete and apply the services provided for in previous case plans. Bonnie had more than two years to show progress on a case plan regarding her son, but failed to do so. Appellants had almost three years in which to correct problems and utilize services provided before permanent custody of A.S.'s sister was granted to the agency, and yet they failed to make more than minimal progress. Moreover, nothing in the current case indicates that appellants have the desire or motivation to do more this time. Instead, the facts of this case reveal that appellants failed to follow through on the first and most basic step to show commitment toward their daughter, as they continuously failed to attend visits with the child. Past history is often the best predictor of future conduct. While surely people can change, the facts do not indicate that appellants have the motivation or ability to follow through and do what is necessary to regain custody of their child.
 {¶ 38} In conclusion, we find no error in the trial court's decision to grant permanent custody of A.S. to BCCSB. The trial court's decision is supported by clear and convincing evidence and the trial court's findings are not against the manifest weight of the evidence. Appellants' assignments of error are overruled.
 {¶ 39} Judgment affirmed.
Walsh and Hendrickson, JJ., concur.
Hendrickson, J., retired, of the Twelfth Appellate District, sitting by assignment of the Chief Justice, pursuant to Section6(C), Article IV of the Ohio Constitution.
[1] Subsequent paternity testing established that Kenneth is the father of A.S.