[Cite as *In re K.Z.*, 2020-Ohio-1013.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

IN THE MATTER OF: : 
:
K.Z., A.Z., and B.Z. :
:
:
: Case No. 19CA22
: 19CA23
: 19CA24
: 19CA25
: 19CA26
: 19CA27
:
: DECISION AND JUDGMENT
: ENTRY
:
:

_____

**APPEARANCES**:

Evan N. Wagner, Columbus, Ohio, for Appellant Mother.

Julie D. Steddom, Georgetown, Ohio, for Appellant Father.

Krystin N. Martin, Assistant Pickaway County Prosecuting Attorney, Circleville, Ohio, for Appellee.

_____

Smith, P.J.

{¶1} T.Z. and E.Z., the children's biological parents, separately appeal the trial court's judgments that granted Pickaway County Department of Jobs and Family Services ("the agency") permanent custody of their three children: (1) eight-year-old K.Z.; (2) seven-year-old A.Z.; and (3) three-and-one-half-year-old B.Z.

The mother raises the following assignment of error:

The trial court's decision to grant the agency's motion for permanent custody with respect to all three children was against the manifest weight of the evidence.

{¶2} The father raises the following assignment of error:

The trial court's termination of Father's parental rights and award of permanent custody of Father's three children to Pickaway County Job and Family Services was not supported by clear and convincing evidence and was, therefore, rendered against the manifest weight of the evidence.

{¶3} In August 2015, the agency received a referral that B.Z., the parents' newborn child, showed signs of drug withdrawal. The agency subsequently filed complaints that alleged B.Z. is abused and dependent and that his two siblings, A.Z. and K.Z., are dependent. Shortly after adjudication, the mother was imprisoned for aggravated assault, and the children lived with the father subject to the agency's protective supervision. After the mother's release from prison, the children lived with both parents subject to the agency's protective supervision.

{¶4} In January 2017, the court entered ex parte orders that placed the children in the agency's temporary custody. The court found that the parents tested positive for methamphetamine and that the mother tested positive for alcohol.

{¶5} Throughout the pendency of the 2015 cases, the mother entered two different counseling programs and did not successfully complete either of them. In late 2015 and early 2016, the mother completed a drug and alcohol assessment and was diagnosed with opioid use disorder. The provider recommended counseling, case management, sober support, and drug screens. The mother completed nine drug screens, and five returned positive for amphetamines or opiates, or they were diluted. In March 2017, the mother was discharged for non-compliance.

{¶6} After the mother's March 2017 discharge, the agency referred the mother to Pickaway Area Recovery Services (PARS) for alcohol and drug treatment and mental health counseling. The mother refused to engage in any services at PARS.

{¶7} In July 2017, the mother completed alcohol/drug and mental health assessments at Scioto Paint Valley Mental Health. The mother reported that she previously had been diagnosed with bipolar disorder, personality disorder, paranoid schizophrenia, and depression/anxiety. The provider diagnosed the mother with depression, post-traumatic stress disorder, and severe opiate use disorder. The provider recommended that the mother complete an individual service plan of group counseling, individual weekly counseling, and case management to address the mother's alcohol and drug issues. The provider additionally recommended that the mother attend weekly group counseling and treatment for her mental health issues. The mother eventually was terminated due to noncompliance.

{¶8} In August 2017, the agency filed new complaints involving the three children and dismissed the 2015 complaints.[1] The new complaints essentially restated

---

[1] We observe that the agency asserted that it dismissed the 2015 complaints and filed new complaints due to the passing of the statutory timeframe. We note, however, that in *In re Young Children*, 76 Ohio St.3d 632, 669 N.E.2d 1140 (1996), the Ohio Supreme Court held that a juvenile court has jurisdiction to enter a dispositional order after the statutory "sunset date" of a temporary custody order when "the problems that led to the original grant of temporary custody have not been resolved or sufficiently mitigated." *Id.* at 638. Additionally, in *In re D.H.*, 4th Dist. Gallia No. 09CA11, 2009–Ohio–6009, we determined that dismissal of a dependency case is not appropriate simply because a temporary custody order reaches the two-year mark. We explained that before a juvenile court dismisses a complaint after finding a child dependent, it should expressly find that any problems that led to the necessity of temporary custody have been resolved or sufficiently mitigated. Both R.C. 2151.353 and *In re Young Children* compel such a requirement. If the court finds that those problems have not been resolved or sufficiently mitigated, then it has the power to make a further dispositional order under R.C. 2151.415. *In re Young Children* at 639. If the court finds those problems are resolved, it should order that the child be returned to the parent or appropriate legal custodian. *Id.* A simple dismissal is not in the best interest of the child and it is not within those six permissible dispositional orders as set forth by the legislature in R.C. 2151.353. *In re D.H.* at ¶ 42–43. Thus, although the agency asserts that it dismissed the 2015 complaints due to the temporary custody orders reaching the two-year mark, as *In re Young Children* and *D.H.* make clear, a trial court still may enter further dispositional orders if the parents have not resolved the problems that led to the grant of temporary custody. A trial court does not lose jurisdiction to enter a dispositional order in an abuse, neglect or dependency case based solely upon the passing of the "sunset date." *See State ex rel. Mowen v. Mowen*, 119 Ohio St.3d 462, 2008-Ohio-4759, 895 N.E.2d 163, ¶ 15 (stating that "the mere passage of the statutory time period for the temporary court order does not divest the juvenile court of jurisdiction over the dependency case"). Moreover, dismissing a complaint solely due to the passage of the statutory time period for a temporary custody order and then immediately refiling the complaint—essentially starting the case anew—does not appear to be the best way to conserve judicial and fiscal resources. More importantly, it prolongs custodial uncertainty. *See In re King*, 4th Dist. Adams No. 99CA671, 1999 WL 624536, *4 (explaining that "children should not be forced to remain in 'foster care drift' any longer than absolutely necessary").

the allegations contained in the 2015 complaints:  at the time of B.Z.'s birth, the newborn child (1) showed signs of chemical withdraw, (2) tested positive for hydrocodone and gabapentin, and (3) received treatment in the neonatal intensive care unit.  The complaint averred that the mother admitted that during her pregnancy she used hydrocodone and gabapentin.  The agency requested the court to place the children in its temporary custody.  The parents later stipulated to the allegations of the complaint and the court adjudicated the children dependent.  The court placed the children in the agency's temporary custody.

{¶9} The agency developed case plans for the parents to follow that identified the same basic struggles that have existed since the agency filed its 2015 complaints.  The case plan required the mother to (1) maintain clean and safe housing for the family without relying upon others for financial assistance, (2) confirm her attendance for weekly visits with the children and attend the visits, (3) refrain from using illegal drugs and from abusing prescription medicine, (4) obtain and maintain employment, (5) contact Social Security to apply for disability, (6) attempt to enroll in community college to further her education, (7) complete a drug and alcohol assessment and comply with treatment recommendations, (8) continue to engage in drug treatment counseling to address her substance abuse behaviors, (9) engage in mental health counseling and find a doctor to help manage her mental health conditions, (10) seek medical help to manage her back pain, (11) become self-sufficient so that she need not rely upon the agency to provide for the children's basic needs, (12) have no further reports of abuse or neglect,

---

Even though we may question whether the agency's refiled complaints were the most efficient use of resources, neither the mother nor the father have asserted any error with the agency's decision to dismiss and then refile the complaints.  Moreover, other courts "have upheld permanent custody decisions where either complaints or motions were dismissed and refiled."  *See In re Anisha N.*, 6th Dist. Lucas No. L-02-1370, 2003-Ohio-2356, 2003 WL 21040311, *3.

(13) comply with court orders and cooperate with the agency and with the children's guardian ad litem, and (14) submit to random drug screens.

{¶10} The case plan required the father to (1) maintain clean and safe housing for the family without relying on others for financial assistance, (2) obtain and maintain employment that will allow him to provide for the children's basic needs, (3) complete an alcohol and drug assessment and follow treatment recommendations, (4) comply with court orders and cooperate with the agency and with the guardian ad litem, (5) submit to random drug screens, and (6) discontinue illegal drug activity including abusing prescription medications.

{¶11} Shortly after the agency filed the 2017 complaints, the parents became homeless and eventually moved into a camper. By the summer of 2018, the parents still had not obtained housing. Thus, the agency filed motions that requested the court to place the children in its permanent custody.

{¶12} After the agency filed its permanent custody motions, the parents intensified their efforts to complete the case plan requirements. They obtained housing in Columbus, Ohio, and found jobs. The mother reported that she worked part-time at a fast food restaurant, and the father stated that he worked for a temporary service. The mother once again sought mental health counseling.

{¶13} In March 2019, the court held a hearing to consider the agency's permanent custody motions. At the hearing, caseworker Dave Groff testified that throughout the history of the 2015 and 2017 cases, the parents struggled to obtain housing and to become self-sufficient. Groff further indicated that the mother failed to adequately address her

mental health and substance abuse issues and that the father seemed to minimize the concerns regarding the mother's mental health and substance abuse issues.

{¶14} Groff recognized that the parents recently secured housing, but he explained that the parents did not produce a copy of their lease until trial, they did not verify their ability to afford the rent, and they accepted some assistance from family members. Groff stated that although the physical structure of the home appears adequate, the mother had a support dog that tried to bite him and the children's guardian ad litem during their visits. Groff also related that in January 2019, the father was charged with theft.

{¶15} Groff explained that the agency had concerns that the mother continually abused pain and other prescription medications based upon a prior diagnosis of opioid dependence. Groff reported that the mother provided a prescription list printed from the pharmacy and that the list showed multiple prescriptions for the same medication but from different doctors. He stated that the mother had a prescription for Seroquel from two different doctors and had "numerous pain medications prescribed from different doctors, different times."

{¶16} Groff related that the agency attempted to verify that the mother was taking her medication as prescribed by asking to do pill counts, but the mother refused to allow him to do pill counts when requested.

{¶17} Groff stated that the parents did not always submit to random drug screens upon request. He indicated that the most recent refusal occurred in January 2019, after a court hearing. Groff explained that although the parents agreed to go to the agency for the drug screens, they never appeared. Groff reported that he spoke to the parents about

their failure to appear, and the parents claimed that they had to drive to Columbus to help a friend. Groff also related that on March 8, 2019, he asked the mother to take a drug screen, but she refused. Groff testified that the mother claimed that the "tests were rigged" and indicated that "she didn't trust them."

{¶18} Groff reported that the mother attempted to engage in counseling programs but did not successfully complete any of them. He acknowledged that the mother recently began counseling at a new center, but he explained that the mother consistently refused to sign releases that would have allowed him to review whether the treatment she received adequately resolved the agency's concerns so as to permit the children to return home. Groff stated that the mother signed releases that allowed him to verify her attendance and nothing else.

{¶19} Groff explained that the father had positive drug screens throughout the case but that he eventually entered a suboxone treatment program and appears compliant. Groff expressed concern, however, that the father would not permit the agency to conduct pill counts of the father's prescribed medication and that he also refused to produce lists of his prescription medications.

{¶20} Groff stated that he observed some of the patient's supervised visits with the children and that he did not have any "major concerns" regarding the parents' ability to interact with the children, except that the parents discussed inappropriate topics with the children. Groff testified that the parents frequently discussed upcoming court proceedings with the children and promised the children that they would be returning home soon. Groff explained that the visits otherwise appeared to go well and that the children appeared especially bonded with their father.

{¶21} Groff testified that B.Z. lives with a foster family and appears to "be right at home." B.Z.'s foster parents have shown interest in adopting him. The other two children, A.Z. and K.Z., live in a different foster home and seem to "like it there." Groff indicated that A.Z. and K.Z. have reported that the foster parents "are nice to them and take care of them." A.Z. and K.Z.'s foster parents have not shown interest in adopting the two girls.

{¶22} Groff stated that he still has concerns about returning the children to the parents' home. He explained that the parents' stability has been an ongoing concern, in addition to the mother's mental health and substance abuse issues. Groff reported that he also has concerns about the parents' ability to provide for the children's basic needs. He recognized that the parents indicated that they both currently are employed, but Groff related that the parents had not submitted income documentation. Groff further testified that he remained concerned about the parents' ability to live a law-abiding lifestyle given the father's recent theft charge.

{¶23} Lori Houston, a licensed social worker at North Community Counseling Center (NCCC), testified that in February 2019 she started counseling the mother. Houston stated that through the date of the permanent custody hearing, the mother had attended three appointments and had cancelled between four and six appointments. Houston reported that she had not yet been able to develop a treatment plan for the mother because she has not been able to meet with the mother enough times to develop a plan that will address the mother's issues.

{¶24} The mother testified and explained that B.Z. was born showing signs of drug withdrawal due to the amount of drugs that the hospital gave her during childbirth.

The mother denied that she abuses drugs or alcohol. She stated that she has never taken amphetamines or methamphetamines but that she did use cocaine or crack cocaine when she was younger. The mother reported that she has taken morphine but that she had an allergic reaction to it.

{¶25} The mother agreed that she had a history of mental health issues. She testified that she experienced anxiety and panic attacks after the birth of her first child and that she was diagnosed with post-traumatic stress disorder when she was in prison.

{¶26} The father testified that the drug screens conducted throughout the case were not accurate. The father denied that he had used amphetamines, MDMA, methamphetamines, morphine, or cocaine despite returning drug screens positive for those substances. When asked why he tested positive for morphine at the time he took the drug screen, the father responded that he had "no clue." The father stated that he took Vicodin to alleviate "chronic back pain."

{¶27} The father reported that he entered a suboxone treatment program in July 2017 as an alternative to taking pain medication. The father stated that he continues to receive treatment and engages in counseling.

{¶28} The father did not believe that the mother had any mental health issues that prevented the children from being returned to the parents. When asked whether he believed that the mother has bipolar disorder, the father responded that he "think[s] everybody in this room is bipolar." The father stated that he does not have any concerns about the mother's ability to provide proper care for the children and that he does not believe that the mother has any mental health issues that would prevent her from being able to adequately care for the children.

{¶29} The father also blamed the hospital for B.Z. displaying signs of drug withdrawal at birth. The father stated that the mother received drugs to alleviate the pain associated with childbirth and that B.Z. absorbed the drugs while breastfeeding. The father also claimed that the hospital was "dusty" and caused the child to sneeze.

{¶30} On May 29, 2019, the trial court granted the agency permanent custody of the three children. The court found that the children had been in the agency's temporary custody for well over twelve months of a consecutive twenty-two-month period.

{¶31} The court considered the children's interactions and interrelationships with their parents and other care providers. The court evaluated the parents' visits with the children and noted that they attended most of the supervised visits. The court noted that the children appear bonded to their parents and with one another. But during the visits, the visitation center staff "routinely corrected" the parents "for discussing the case with the children, advising the children they would be coming home very soon, [and] telling their children they do not need to mind or obey their foster parents." The court thus found that the parents have not discussed the case in a positive manner with the children. Instead, they have been "basically promoting an adversarial atmosphere."

{¶32} The court considered the children's wishes and noted that K.Z. and A.Z. stated that they wish to live with their parents. The court indicated that B.Z. lacks sufficient maturity to state his wishes. The court also noted that the children's guardian ad litem recommended that the court award the agency permanent custody of the children.

{¶33} The court determined that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting the

agency permanent custody. The court found that the mother cannot provide the children with a legally secure permanent placement. The court pointed out that the mother repeatedly failed to follow through with substance abuse and mental health treatment recommendations and that she only recently obtained housing and part-time employment.

{¶34} The court found the mother's failure to complete any of the substance abuse or mental health counseling programs "concerning." The court observed that the mother had been diagnosed with an opioid use disorder and had received other "serious mental health diagnoses." The court further stated that the mother refused to sign releases that would have allowed the agency to verify the type of treatment the mother was receiving and whether her treatment indicated that the children could be returned to her. The court additionally found that throughout the history of the case, the mother tested positive for opiates, amphetamines, and methamphetamines.

{¶35} The court also concluded that the father cannot provide the children with a legally secure permanent placement. The court noted that the father failed to cooperate with the agency and failed to take drug screens when the agency requested in order to demonstrate that he no longer is abusing drugs. The court further observed that the father refuses to recognize the mother's need to seek treatment for her substance abuse and mental health issues and believes that the mother can adequately care for and protect the children despite her opioid dependency and mental health issues.

{¶36} The court recognized that although the father completed a drug and alcohol assessment, he tested positive at various times for opiates and amphetamines. The court indicated that the father currently is enrolled in a suboxone program and apparently is compliant. The court noted, however, that he and the mother refused to allow the agency

to do pill counts when requested and that in January 2019, they failed to take a drug screen when requested.

{¶37} The court found that the father acknowledges that the mother has been diagnosed with an opioid dependency and that she has been treated for bipolar depression. The court determined that although the father recognizes the mother's issues, he "continues to minimize Mother's need for treatment and sees no limit to her ability to care for their children." The court pointed out that the father testified that "everybody has bipolar disorder." The court also noted that the father blamed the hospital for B.Z. showing drug withdrawal signs at birth rather than admitting that the mother abused drugs while pregnant with B.Z.

{¶38} The court noted that the parents lived in the same house from the fall of 2016 to the fall of 2017. The landlord decided not to renew the lease and the parents became homeless. The parents lived in a camper for a few months and in October 2018, they obtained housing in Columbus. The parents did not, however, inform the agency or the children's guardian ad litem that they had obtained the Columbus residence until early 2019. The court found that although the parents' current housing appears adequate, the guardian ad litem and the caseworker stated that the mother's therapy dog tried to bite them.

{¶39} The court recognized that the parents both reported that they now are employed but that they did not provide proof of employment until the time of trial.

{¶40} The court found that the agency provided the parents with "a case plan that if followed would have placed [the parents] in a position to be able to appropriately care for their children, yet instead of cooperating and complying they did everything they

could to not only refuse and fail to comply but to make it impossible for [the agency] to assist them." The court stated that the parents "failed to screen consistently to show they were not using or abusing drugs, they refused pill counts, they refused to provide employment information, they failed to provide housing information, they refused to sign releases after the initial release in order for the case worker to follow up on their mental health and drug and alcohol treatment and they failed to provide prescription lists." The court also observed that in early 2019, the father had been charged with theft.

{¶41} The court thus determined that placing the children in the agency's permanent custody is in their best interest and granted the agency permanent custody of the children. This appeal followed.

ANALYSIS

{¶42} In her sole assignment of error, the mother asserts that the trial court's decision to grant the agency permanent custody of the children is against the manifest weight of the evidence. In particular, the mother contends that clear and convincing evidence does not support the court's finding that placing the children in the agency's permanent custody would serve their best interests. The mother emphasizes that the children shared a positive bond with her and the father and that the children wish to return home and live with the parents.

{¶43} In his sole assignment of error, the father similarly argues that the trial court's best interest finding is against the manifest weight of the evidence. The father asserts that placing the children in the agency's permanent custody is not in the children's best interest because "he substantially completed the case plan," "reunification could occur very quickly," and the agency failed to show that placing the children in its

permanent custody will "guarantee[]" that the children achieve a legally secure permanent placement.

STANDARD OF REVIEW

{¶44} A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 53 (4th Dist.). When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶45} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43. In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could

have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *R.M.* at ¶ 55.

{¶46} Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins* at 387, 678 N.E.2d 541, quoting *Martin* at 175, 485 N.E.2d 717. A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.*, quoting *Martin* at 175, 485 N.E.2d 717.

## PERMANENT CUSTODY PRINCIPLES

{¶47} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶¶ 8-9. A parent's rights, however, are not absolute. *D.A.* at ¶ 11. Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App.1974). Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

PERMANENT CUSTODY FRAMEWORK

{¶48} R.C. 2151.414(B)(1) specifies that a trial court may grant a children

services agency permanent custody of a child if the court finds, by clear and convincing

evidence, that (1) the child's best interest would be served by the award of permanent

custody, and (2) any of the following conditions applies:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> (b) The child is abandoned.
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

The statute further states:

> For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

R.C. 2151.414(B)(1)(e).

{¶49} In the case at bar, the trial court found that the children had been in the agency's temporary custody for more than twelve months of a consecutive twenty-two-month period, and thus, that R.C. 2151.414(B)(1)(d) applies. Neither parent challenges the court's finding. Therefore, we do not address the issue. We simply note that the evidence in the record demonstrates that the children have been in the agency's temporary custody for well over twelve months of a consecutive twenty-two-month period.

{¶50} R.C. 2151.414(D)(1) requires a trial court to consider all relevant, as well as specific, factors to determine whether a child's best interest will be served by granting a children services agency permanent custody. The specific factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶51} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56; *accord In re C.G.*, 9th Dist. Summit Nos. 24097 and 24099, 2008-Ohio-3773, 2008 WL 2906526, ¶ 28; *In re N.W.*, 10th Dist.

Franklin Nos. 07AP–590 and 07AP-591, 2008-Ohio-297, 2008 WL 224356, ¶ 19.

However, none of the best interest factors requires a court to give it "greater weight or

heightened significance." *C.F.* at ¶ 57. Instead, the trial court considers the totality of

the circumstances when making its best interest determination. *In re K.M.S.*, 3d Dist.

Marion Nos. 9–15–37, 9–15–38, and 9-15-39, 2017-Ohio-142, 2017 WL 168864, ¶ 24; *In

re A.C.*, 9th Dist. Summit No. 27328, 2014-Ohio-4918, 2014 WL 5690571, ¶ 46. In

general, "[a] child's best interest is served by placing the child in a permanent situation

that fosters growth, stability, and security." *In re C.B.C.*, 4th Dist. Lawrence Nos.

15CA18 and 15CA19, 2016-Ohio-916, 2016 WL 915012, ¶ 66, citing *In re Adoption of

Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

ANALYSIS OF BEST INTEREST FACTORS

Children's Interactions and Interrelationships

{¶52} In the case at bar, the mother argues that the trial court did not fully

consider all of the evidence relating to the children's interactions and interrelationships

and that the court did not accord adequate weight to the children's interactions and

interrelationships with the parents. The mother asserts that the trial court should have

preserved the sanctity of the family unit, especially when the children displayed evident

affection and love for their parents and for one another.

{¶53} The father's brief does not specifically focus on the children's interactions

and interrelationships. Nevertheless, we will consider the children's interactions and

interrelationships as it relates to both parents.

{¶54} As the trial court noted, the children appear bonded to their parents. The

evidence indicates that the children enjoyed visiting with their parents. The agency did

not have any concerns regarding the parents' ability to engage with the children in an appropriate manner, except to note that the parents discussed inappropriate topics with the children. The evidence shows that the parents frequently discussed the case with the children and promised the children that they would be returning home soon. The agency routinely reminded the parents to refrain from elevating the children's hopes and from discussing the court proceedings.

{¶55} Although the superficial relationship between the parents and the children may not have given the agency much cause for concern, B.Z. was born addicted to drugs and both parents testified at the hearing that B.Z. was born addicted to drugs due to the drugs the mother received during labor and delivery. Neither parent would admit that B.Z.'s state resulted from the mother abusing drugs during her pregnancy. We observe, however, that the mother admitted the allegations of the complaint and that the complaint asserted that the mother admitted that she used drugs while pregnant with B.Z. The parents' failure to accept responsibility for B.Z.'s status at birth suggests that the parents do not possess protective capacities and are unwilling to accept that drug abuse negatively impacts their children. Instead, the parents' failure indicates that they tend to minimize the impact of, and attempt to avoid any blame for, their pattern of drug abuse.

{¶56} Furthermore, although we commend the father for engaging in a drug treatment program, the mother has not completed any drug treatment program that would allow for any conclusion that she has taken steps to conquer her drug abuse issues. Additionally, the father fails to recognize that the mother continues to need treatment. Furthermore, the parents refused to take a drug screen within two months of the date of the permanent custody hearing. Had the parents truly been committed to ensuring the

return of their children, then the parents would have done everything the agency requested, especially considering the nearness of the permanent custody hearing. Instead, the parents continued to display a lack of cooperation.

{¶57} Thus, while the superficial bonds and interactions between the parents and their children may be strong, the parents' conduct does not show that they prioritize their children and their children's needs over their own desires. Neither parent recognizes the negative impact that their conduct has on their children's health, safety, and well-being. The evidence, therefore, does not suggest that the parents share positive interrelationships with the children. *See generally In re A.T.*, 9th Dist. Summit No. 23065, 2006-Ohio-3919, 2006 WL 2141250, ¶ 33 (considering mother's denials and attempted excuses for "all negative implications from her behavior" when evaluating the children's interrelationships).

{¶58} In contrast to the negative implications of the parents' conduct, the foster families provide the children with environments free from the negative implications that result from substance abuse and untreated or inadequately treated mental health conditions. B.Z. is doing well in his foster home. K.Z. and A.Z. report that the foster family is kind to them. Even though the children may be more bonded to their parents than to the foster families, the children are too young to recognize the negative impact that their parents' conduct may have on their health, safety, and well-being both now and in the future.

{¶59} We recognize that family unity and blood relationship may be "important factors" that a trial court evaluating a child's best interest should consider. However, the mere existence of a blood relationship is not controlling. *See In re J.B.*, 8th Dist.

Cuyahoga Nos. 98518 and 98519, 2013-Ohio-1703, 2013 WL 1799681, ¶ 31. Instead, "neglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term * * * and their best interest is the pivotal factor in permanency case[s]." *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, 2009 WL 3321019, ¶ 35. Thus, while biological relationships may be important considerations, they are not controlling when assessing a child's best interest. See *In re J.B.*, 8th Dist. Cuyahoga Nos. 98566 and 98567, 2013-Ohio-1706, 2013 WL 1799853, ¶ 163; *accord In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 65 (8th Dist.) (stating that the "existence of a positive relationship," by itself, is not determinative of the child's best interest); *In re S.S.-1*, 4th Dist. Athens No. 17CA44, 2018-Ohio-1349, 2018 WL 1720650, ¶ 76.

## Children's Wishes

{¶60} The trial court considered the children's wishes and noted that the two girls, K.Z. and A.Z., want to return home and live with their parents. The court found that B.Z. is too young to express his wishes in a meaningful manner. The court noted that the children's guardian ad litem recommended that the court grant the agency permanent custody of the children.

## Custodial History

{¶61} B.Z. has been in the agency's temporary custody for most of his young life. After showing signs of drug withdrawal at birth, the court placed B.Z. in the agency's temporary custody. He lived with his father for a short period of time while the mother was imprisoned. He then lived with both parents until January 2017, when the court again placed him in the agency's temporary custody.

{¶62} K.Z. and A.Z. lived with their parents without agency intervention until they were approximately four years and two years of age, respectively.  In August 2015, the agency became involved with the family due to B.Z. being born showing signs of drug withdrawal.  K.Z. and A.Z. remained living with their parents subject to the agency's protective supervision.  In January 2017, K.Z. and A.Z. entered the agency's temporary custody and have remained in the agency's temporary custody since that time.

{¶63} Thus, when the agency filed its July 2018 permanent custody motions, the children had been in the agency's temporary custody for more than twelve months of a consecutive twenty-two-month period.

Legally Secure Permanent Placement

{¶64} "Although the Ohio Revised Code does not define the term 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met."  *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56, citing *In re Dyal*, 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 171 Ohio App.3d 248, 2007-Ohio-2007, 870 N.E.2d 245, ¶ 34 (10th Dist.) (Sadler, J.,

dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"); Black's Law Dictionary 1354 (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *Id.* at 1139 (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.* at ¶ 56.

{¶65} In the case at bar, the evidence indicates that the parents obtained a house and that the physical environment appears adequate for the children's physical needs. However, the evidence does not establish that the children will live in a safe, stable, and consistent environment. First, the mother has taken few steps to conquer her substance abuse and mental health issues. The trial court found that the mother suffers from "serious" mental health issues and that the mother has not allowed the agency to ascertain whether she had engaged in meaningful counseling so as to enable the agency to determine whether the children would be safe if left in her care. Furthermore, the mother did not successfully complete any substance abuse treatment program, refused to submit to all random drug screens, and refused to permit the agency to conduct pill counts to ensure that the mother was taking her medication as prescribed.

{¶66} Second, the father appears to enable the mother and refuses to recognize the risks that her substance abuse and mental health issues pose to the children. The

father would not recognize that the mother's substance abuse resulted in B.Z. being born showing signs of drug withdrawal. Instead, he blamed it on the hospital environment and the drugs the mother received during labor and delivery.

{¶67} Third, while we commend the parents for obtaining housing and employment, we observe that they did so only after the agency filed its July 2018 permanent custody motions. Before that point, the parents had been involved with the agency since August 2015 and knew that the case plan required them to obtain a safe, stable, and permanent home as well as the financial means to provide for the children's basic needs. The parents did not offer any explanation why they did not find a stable, permanent home and employment at some point during the nearly three years before the agency filed the July 2018 permanent custody motions. Although the parents lived in the same home for a one-year period during 2016 and 2017, after they left that home, they were homeless or living in a camper for approximately one year before they found a place to live in Columbus. In sum, the evidence fully supports the trial court's conclusion that the parents cannot provide the children with a legally secure permanent placement.

{¶68} Furthermore, the agency investigated other placements but did not deem any to be suitable. Instead, the agency determined that granting the agency permanent custody of the children would give them the best chance to obtain a legally secure permanent placement. The evidence shows that B.Z.'s foster family is interested in adopting him. Although K.Z. and A.Z.'s foster family does not wish to adopt the two girls, the agency intends to find an adoptive placement for the children.

{¶69} We recognize that the mother contends that a court must find that the children are likely to achieve a legally secure permanent placement by granting the agency permanent custody. She contends that before a court may grant an agency permanent custody of a child, the agency must establish that the child likely would achieve a legally secure permanent placement if placed in the agency's permanent custody. To support her argument, the mother cites *In re A.W.*, 9th Dist. Lorain No. 09CA9631, 2010-Ohio-817, 2010-WL-761327.

{¶70} In *A.W.*, the twelve-year-old child suffered from "serious mental health problems" and lived in a mental health treatment facility while the case was pending. *Id.* at ¶ 5. The trial court granted the agency permanent custody of the child, and the appellate court reversed. The court reversed, in part, because the agency did not present any evidence that the child would be "any more likely to achieve a legally secure permanent placement in the permanent custody of the agency than she would be in her current, temporary placement." *Id.* at ¶ 24. The court reasoned that R.C. 2151.414(D)(1)(d) "implicitly" requires an agency "to prove that a legally secure permanent placement for [the child] would likely be achieved through a grant of permanent custody to the agency." *Id.* The court observed that the agency had not been able to find an adoptive placement for the child and that "the agency had been unable to find even a temporary placement for [the child] outside the mental health facility." *Id.* Moreover, the court noted that the record lacked evidence concerning the child's "mental health history, her treatment plan, or her prognosis for the future." *Id.* The court thus determined that "it was unclear whether the agency could ever find a suitable permanent placement for this child." *Id.*

{¶71} In the case at bar, the evidence does not suggest that the children suffer from mental health problems or any other problems that would prevent them from being placed in an adoptive home. Simply because the agency may not have located an adoptive home at the time of the permanent custody hearing does not mean that the children are unlikely to find a legally secure permanent placement if placed in the agency's permanent custody.

{¶72} We also note that R.C. 2151.414(D)(1)(d) does not state that a trial court must consider whether the child likely will achieve a legally secure permanent placement if the court grants the agency permanent custody of the child. Instead, the statute states that the court shall consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." Nothing in the plain language of the statute requires a court to find that a legally secure permanent placement likely will be achieved if the court grants the agency permanent custody. Instead, the plain language of the statute indicates that the court must consider (1) whether the child needs a legally secure permanent placement and (2) whether the child can achieve a legally secure permanent placement if the court does not grant the agency permanent custody. The court considered both of the foregoing, and the evidence supports the court's findings.

Case Plan Compliance

{¶73} We recognize the father's assertion that he substantially complied with the case plan by seeking substance abuse treatment, by obtaining employment, and by locating a physically appropriate space to live. Although we commend the father's efforts to comply with the case plan and to engage in services, we observe that his

compliance with the housing and employment aspects of the case plan did not occur until after the agency filed its permanent custody motion. Moreover, as we have often noted, a parent's case plan compliance may be a relevant, but not necessarily conclusive, factor when a court considers a permanent custody motion. *E.g., In re K.M.*, 4th Dist. Ross No. 19CA3677, 2019-Ohio-4252, 2019 WL 5213026, ¶ 70, citing *In re W.C.J.,* 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 46 (stating that "[s]ubstantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency"); *see In re S.S.*, 4th Dist. Jackson No. 16CA7 and 16CA8, 2017-Ohio-2938, ¶ 164; *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 59; *In re N.L.,* 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 35 (stating that substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous"); *In re S.C.,* 8th Dist. Cuyahoga No. 102349, 2015-Ohio-2280, ¶ 40 ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification."); *In re West,* 4th Dist. Athens No. 03CA20, 2003-Ohio-6299, ¶ 19. "Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, 'it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights.' " *W.C.J.* at ¶ 46, quoting *In re Gomer*, 3d Dist. Wyandot Nos. 16-03-19, 16-03-20, and 16-03-21, 2004-Ohio-1723, ¶ 36.

{¶74} Consequently, we do not agree with the father that his compliance with the case plan shows that the trial court's best interest determination is against the manifest weight of the evidence. Instead, the father's case plan compliance is a factor that the

court might have chosen to consider when reviewing the options that would serve the children's best interests.

## Balancing

{¶75} Based upon the totality of the evidence before the court and the lengthy history of the case, we are unable to conclude that the trial court's best interest determination is against the manifest weight of the evidence. True, the children are bonded to the parents, and the two girls in particular would like to return home and live with their parents. Preserving the familial bond certainly is preferable. However, the parents unfortunately have not fully resolved the concerns that led to the children's removal from the home. Throughout the history of the case, the mother has demonstrated an unwillingness to adequately address her substance abuse and mental health issues. Instead, she obfuscated the agency's efforts. The father has complied with parts of the case plan, but the father appears unwilling to realize that the mother's substance abuse and mental health issues, left untreated or inadequately treated, pose safety risks to the children.

{¶76} Furthermore, the agency had been involved with the family for more than three years at the time it filed its permanent custody motions. Throughout all that time, the parents did not establish the stability, safety, and permanency that the children need. Even if at times the parents lived in a stable home, they were unable to maintain a stable home throughout the case. Indeed, they were homeless and living in a camper during the year before the agency filed its permanent custody motions. Not until the agency filed its permanent custody motions did the parents find a place to live and obtain employment.

{¶77} Given the parents' history and the mother's failure to adequately resolve her substance abuse and mental health issues, the trial court could have reasonably determined that returning the children to the parents' custody would not be in their best interests. This court has recognized that a parent's past history is one of the best predictors of future behavior. *In re West*, 4th Dist. Athens No. 05CA4, 2005-Ohio-2977, 2005 WL 1400029, ¶ 28, citing *In re A.S.*, 12th Dist. Butler Nos. CA2004-07-182 and CA2004-08-185, 2004-Ohio-6323, 2004 WL 2698408, ¶ 37 ("Past history is often the best predictor of future conduct. While surely people can change, the facts do not indicate that [the biological parents] have the motivation or ability to follow through and do what is necessary to regain custody of their child."); *In re Vaughn*, 4th Dist. Adams No. 00CA692, 2000 WL 33226177, *7 (Dec. 6, 2000) ("To further the interests of the children, the court must consider any evidence available to it, including a parent's pattern of conduct. Some of the most reliable evidence for the court to consider is the past history of the children and the parents."); *see also In re Brown*, 60 Ohio App.3d 136, 139, 573 N.E.2d 1217 (1st Dist.1989) (stating that the mother's "past parenting history and her ability to comply with prior reunification plans regarding her other children were relevant considerations in the juvenile court's dispositional determination" to award a children services agency permanent custody).

{¶78} Furthermore, we have repeatedly recognized that trial courts need not experiment with a child's welfare:

> "* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to

experiment with the child's welfare to see if he will suffer great detriment or harm."

*In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, 2014 WL 7477958, ¶ 48, quoting *In re Bishop*, 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist.1987).

{¶79} We commend the parents for their success in finding a home and employment. However, the trial court had no obligation to experiment with the children's welfare and test whether the parents will be able to maintain their current home and employment and whether the mother adequately resolved her substance abuse and mental health issues, especially when the mother refused to allow the agency access to her counseling records so as to permit the agency to determine whether the mother's treatment plan indicates that the children would be safe if left in her care.

{¶80} Consequently, we do not believe that the trial court's best interest determination is against the manifest weight of the evidence.

## CONCLUSION

{¶81} Accordingly, based upon the foregoing reasons, we overrule the mother's and the father's assignments of error and affirm the trial court's judgments.

JUDGMENTS AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Hess, J.:  Concur in Judgment and Opinion.

For the Court,

BY: _____

Jason P. Smith
Presiding Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**